# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF VIRGINIA

## CHARLOTTESVILLE DIVISION

| | |
|---|---|
| ANDREA J. FULLER,<br><br>*Plaintiff*,<br><br>v.<br><br>CULPEPER COUNTY, *et al.*,<br><br>*Defendants.* | CASE NO. 3:22-cv-00058<br><br><br>MEMORANDUM OPINION |

This case comes before the Court on Defendants' motion to dismiss, Dkt. 14. Plaintiff Andrea Fuller filed *pro se* claims under the Rehabilitation Act of 1973 and the Americans with Disabilities Act of 1990 related to her employment termination. She asserts that she was terminated in retaliation for complaining of sexual harassment and because she was regarded as having a disability. For the following reasons, Defendants' motion to dismiss will be granted.

## I. Facts

The following facts are alleged in Plaintiff's Complaint and assumed true for purposes of resolving this motion. *See King v. Rubenstein*, 825 F.3d 206, 212 (4th Cir. 2016) (reiterating the appropriate standard of review).

Plaintiff was employed with Culpeper County, Virginia's Department of Public Safety Communications ("Public Safety Communications") from November 15, 2011 until October 11, 2019. Dkt. 2 ("Compl.") ¶ 1. On October 11, 2019, Defendants placed Plaintiff on paid administrative leave, and a personnel investigation regarding Plaintiff was conducted. *Id.* Defendants terminated her on November 5, 2019. *Id.* ¶ 2. After grievance proceedings, she was

reinstated to retroactive unpaid administrative leave status on December 17, 2019. *Id.* ¶ 3. She was terminated again on December 30, 2019. *Id.* ¶ 4.

Plaintiff consistently received high evaluations in quality compliance reviews and yearly evaluations during her employment. *Id.* ¶ 28.[1] Her last received evaluation was dated December 29, 2018. *Id.* She received two promotions while employed with Public Safety Communications—first to Emergency Communications Training Officer on September 21, 2016 and second to Emergency Communications Officer Shift Supervisor on January 4, 2019. *Id.* ¶ 29.

Defendant William E. Martin, Jr., Director of Public Safety Communications, called Plaintiff to his office on September 14, 2018. Going against Public Safety Communications Policy, he asked her to "change her demeanor" on the radio, "by means of 'killing them with kindness' and 'fluffing up' her tone," naming male law enforcement responders who prompted this request. *Id.* ¶ 32.[2] He did not make this request of her other shift members, two of whom were men. *Id.* Plaintiff "believed the directive was being made a condition of her employment by the acting Director and was sexual harassment and discrimination based on her gender." *Id.*

Plaintiff requested that Defendant Martin outline the conversation with her, and he did so in an email.[3] *Id.* When discussing the requested statement, Defendant Martin "questioned if the

---

[1] She consistently scored in the "*Very Proficient* category," "defined as *Consistently exceeds expectations. Above average.*" *Id.*

[2] The Complaint does not allege to whom the change in tone would be targeted or how Defendant Martin went against Public Safety Communications Policy.

[3] The email stated:

> I tried to explain to Sheriff Jenkins and Captain Nick White that I did not feel she was rude or had an attitude with Captain white [sic] or any other units…
>
> I was told that I needed to have a conversation with [Plaintiff] about her attitude and that it was not going to be accepted…

request by the male responders was prompted by Plaintiff Fuller rebuffing their sexual advances." *Id.* ¶ 33. At that point, Plaintiff requested he not continue his questioning. *Id.*

Plaintiff provided Defendant Martin's statement and detailed his questioning to Defendant Jennifer Rosenfeld, Deputy Director of Public Safety Communications. *Id.* ¶ 34. Defendant Rosenfeld contacted the Culpeper County Human Resources Department ("HR") to ask if Defendant Martin's statement and later remarks constituted sexual harassment. *Id.* HR called Plaintiff in the following days, and "[a] formal statement and assertion of a sexual harassment claim were taken during the phone call." *Id.* ¶ 35. Further, HR advised Plaintiff that "the sexual harassment claim would be investigated and she would receive in writing the findings and results of that investigation." *Id.* ¶ 35. Plaintiff awaited the investigation's outcome up to the time she was placed on paid administrative leave on October 11, 2019. *Id.* ¶ 36.

---

During my meeting with [Plaintiff] I explained the above information with her (I feel that [Plaintiff] is very professional and that she does her job very well, that I would like to have more dedicated dispatchers like her, I also told her that I explained it to CSSO staff, that if I were on the other side of the radio and needed help I wanted [her] in the seat. Because I know her abilities and that she would get me help if I needed it…

I asked [Plaintiff] if she could do her best to kill them with kindness, and add some fluff when speaking with the units in the field…

Andrea but (sic) up that if she were to give more fluff and they took it as her being unprofessional how would this be handled. I asked her to bring this to her supervisors (sic) (Renee) attention and followed up with Jenny or myself…

I continued to discuss this with Andrea she was very upset and almost started to cry, it was not my intent to make her upset as this was upsetting for me to. (sic) As I value her as a dedicated professional with our Center. I asked her to do her best and the conversation ended.

*Id.*

After Plaintiff filed her sexual harassment claim, around October 15, 2018, Public Safety Communications employees made their annual bid for shift assignments. *Id.* ¶ 37. They did so in order of tenure. *Id.* Plaintiff had the highest tenure in her rank at the time, so she was the first to bid for that rank. *Id.* She bid to be moved from day shift (6 a.m. to 6 p.m.) to night shift (6 p.m. to 6 a.m.) to avoid contact with Defendant Martin, whose shift was from 8 a.m. to 4 p.m. *Id.*

Plaintiff worked as a nighttime Emergency Communications Officer Shift Supervisor for three months without additional pay, before being promoted to that position on January 4, 2019. *Id.* ¶ 38. Due to the promotion, she was "last in [the] line of tenure for th[at] rank," so she was "unable to bid to change shifts voluntarily." *Id.*

In her new role, Plaintiff had difficulty leading two of her shift members: Lisa Bennett and Sylvia Whetzel (Emergency Communications Training Officers). *Id.* ¶ 39. She contends that Bennett and Whetzel, as well as daytime supervisor Jeff Seation, "made allegations about Plaintiff Fuller's work performance and abnormal behavior to support both the regard for disability of mental impairment and the adverse employment actions that were taken against [her.]" *Id.* ¶ 41. Plaintiff requested Defendant Rosenfeld meet with her privately to discuss her difficulty leading Bennett and Whetzel. *Id.* They met around May 29, 2019. *Id.* Defendant Rosenfeld offered instruction "on appropriate counseling and reprimands to take" with Bennett and Whetzel. *Id.* ¶ 40. When Plaintiff expressed regret that she accepted the position and indicated a "desire to return to her lower rank due to the interpersonal issues," Defendant Rosenfeld said she would talk to them, also stating "We want you in this position." *Id.*

Around September 13, 2019, Plaintiff, reported for duty and learned that law enforcement had requested a criminal history "stemming from a call handled by the day shift employees." *Id.* ¶ 42. She discussed the criminal history request with Seation, and others overheard them. *Id.* She

– 4 –

remarked that "providing the criminal history was 'a day shift problem,'" and Seation responded

that he hoped the night shift did not worsen based on Friday the 13th and the full moon. *Id.*

Plaintiff "replied sarcastically 'I'm not doing it,' 'I'm not going to do that,'" by which she

"mean[t] she did not want further difficulties to arise on the shift or for the shift to be stressful."

*Id.* Plaintiff and Seation understood the conversation "to be in good humor and jest." *Id.*

Around September 26, 2019, Plaintiff received an email from Defendant Rosenfeld,

which requested to discuss "an incident regarding a criminal history." *Id.* ¶ 43. They scheduled a

meeting for October 1, 2019, at Defendant Rosenfeld's request. *Id.* Plaintiff, Defendant

Rosenfeld, and Seation attended the meeting. *Id.* ¶ 44. Though Seation explained that he

perceived Plaintiff's statements at issue as humorous, Defendant Rosenfeld told them, "[w]e are

considering whether we are stepping you both down." *Id.* Defendant Rosenfeld also "sharply told

[Plaintiff] to stop speaking when she was first asked to do so," and "struck the table with a

closed fist during the exchange." *Id.* ¶ 45. When Plaintiff asked if the statements at issue "were

possibly presented as pretext for other discrimination or retaliation," Defendant Rosenfeld

"audibly laughed." *Id.* ¶ 46. Defendant Rosenfeld has also "referred to [Plaintiff]'s recollections

of the meeting as lies and demeaning of [Defendant Rosenfeld]'s character." *Id.*

Defendant Rosenfeld, in the October 1, 2019 meeting, counseled Plaintiff against her

September 13, 2019 statements and advised her to tell Seation if she further felt stress or a sense

of being overwhelmed. *Id.* ¶ 47.[4] Plaintiff asserts that facts related to the October 1, 2019

---

[4] In a directive in an email to Defendant Martin, dated October 9, 2019, Defendant
Rosenfeld stated:

> I recommended that if she was feeling overwhelmed to simply communicate that
> to the shift or [Seation] and ask for some assistance, which would be happily
> accepted as [Seation]'s shift is always eager to assist their coworkers. *Id.*

meeting "establish an accommodation presented by Defendant [Rosenfeld] for a regard of mental impairment that, at that time, Plaintiff Fuller was unaware of." *Id.* ¶ 48.[5]

While on duty on October 7, 2019, Whetzel asked Plaintiff about what happened in the October 1 meeting. *Id.* ¶ 49. Plaintiff explained her September 13 statements "did not fit the gravity or tone of the meeting," and "the true cause for the threat of adverse employment action may instead be discriminatory in nature or retaliation for the sexual harassment claim made against [Defendant Martin]." *Id.* Plaintiff had not yet received the investigation results HR promised. *Id.* ¶ 50. She believed the claim was still under investigation. *Id.*

Defendant Martin called Plaintiff on October 11, 2019, telling her she was being placed on paid administrative leave. *Id.* ¶ 51. He gave no reason, advised her to call HR during the leave, and told her she would be notified when she was to return to work.[6] *Id.* No HR employee answered her calls, nor did anyone respond to her requests for a return call. *Id.* ¶ 52.

On November 4, 2019, Defendant Martin called Plaintiff and told her to report to Public Safety Communications on November 5, 2019 to meet with him. *Id.* ¶ 53. Defendant Rosenfeld also attended the November 5 meeting. *Id.* Defendant Martin recounted Plaintiff's September 13 statements and asked her if she would like to resign, which she declined to do. *Id.* She then learned of her termination. *Id.* Defendant Martin "gestured toward [Defendant Rosenfeld] and

---

[5] Nonetheless, Plaintiff did not bring a failure to accommodate claim under the ADA.

[6] She also received an email and letter, which stated:

> You are being placed on paid administrative leave effective immediately pending an internal personnel investigation.
>
> Once the investigation is completed I will notify you. At that time, we will schedule a meeting to discuss my findings.

*Id.*

stated [an] additional basis for [Plaintiff]'s termination was that 'she spoke with subordinates about the meeting of October 1st, lied that she could be demoted, and other untruths'." *Id.* No further statements regarding the personal investigation findings came forward. *Id.*

Plaintiff received a form titled "County of Culpeper Interagency Employee Departure *Information Form*" at the November 5 meeting, and the "*Reason for Leaving*" stated "Terminated." *Id.* ¶ 54. In the *Comments* section of the form, it listed "Failure to uphold standards of conduct related to job duties and performance." *Id.*

The Southern States Police Benevolent Association provided Plaintiff legal counsel for her grievance against the County, based on her voluntarily paid membership through her Public Safety service. *Id.* ¶ 55. During her grievance filing, she presented a case based on the following:

    a.  [She] was not provided proper documentation as to the basis of the adverse employment action of termination.

    b.  [Her] termination [] did not follow the ladder format for disciplinary action outlined in [t]he County's Personnel Management Plan noting this was [her] first disciplinary action in her eight (8) years of service.

    c.  The statements made on or about September 13, 2019 by [Plaintiff] were presented as a pretext for retaliation for the prior sexual harassment claim filed against [Defendant Martin] in September 2018.

*Id.* ¶ 56. The County scheduled a grievance hearing, with the County Administrator for Culpeper County, Defendant John C. Egertson, set to preside. *Id.* ¶ 57.

Plaintiff's legal counsel requested discovery into the 2018 sexual harassment investigation and internal personnel investigation. *Id.* ¶ 58. These requests went unanswered until three business days before the grievance hearing. *Id.* At that point, the Culpeper County Attorney emailed documents to Plaintiff's counsel. *Id.* But the documents provided did not relate to the 2018 sexual harassment claim. *Id.* These documents instead included (1) an undated and unsigned letter to Plaintiff; (2) email exchanges representing conversations involving Bennett,

Whetzel, Seation, Defendant Rosenfeld, Defendant Martin, HR, and/or the County Attorney; and

(3) copies of handwritten notes representing conversations involving the same parties. *Id.*

The undated and unsigned letter addressed to Plaintiff, which proclaims to be a follow-up

to the paid administrative leave notice of October 11, 2019, states:

> Based upon information obtained during the course of the investigation, there were troublesome issues identified related to your continued employment with the County. Due to the results of the internal investigation, there exists credible information that demonstrates and supports your failure to uphold standards of conduct related to your job duties and performance. In sum, the results of the investigation have led to the determination that it is in the best interest of Culpeper County that your at-will employment with the County be terminated.

*Id.* ¶ 59.

The email exchanges, dated from October 8 to October 9, 2019, include Defendant

Rosenfeld seeking written statements about Plaintiff; the October 1, 2019 meeting; and later

conversations with other employees. *Id.* ¶ 60. In an October 9, 2019 email reply from Seation to

Defendant Rosenfeld, Seation made statements regarding Plaintiff's mental capacity:

> [Plaintiff] did express concern wondering if there would be write ups or anything else. It used to not be this bad but again in the last weeks or so something seems different or not just right with how [Plaintiff] understands or thinks things.
>
> Everyone else does it without any issues I don't understand her thinking sometimes on things [sic].

*Id.* ¶ 61. And on October 9, 2019, Defendant Rosenfeld emailed Defendant Martin, stating:

> I then asked [Plaintiff] to explain what happened, which she did. Then she began explaining why she did what she did and I advised her to stop. She advised that I let Jeff [Seation] speak and she wanted to speak. I advised her to stop and let me speak for a minute. At this time, I explained that [Plaintiff] making the comment that she was not going to run the criminal history, that she refused to do it, was absolutely unacceptable and would not be tolerated; especially in her position as a shift supervisor. I then asked if she had any questions or comments and she stated that she didn't feel safe saying anything. I laughed to myself and asked her she didn't feel safe (sic). She said that she didn't feel that I would listen to what she had to say.

*Id.* ¶ 62.

In emailing Defendant Martin on October 9, 2019, Defendant Rosenfeld referenced a training trip she was then attending with Bennett and Whetzel. *Id.* ¶ 63. Defendant Rosenfeld wrote of statements that Bennett and Whetzel made about Plaintiff and her mental health:

> I have some serious concerns about the comments they have made to me about [Plaintiff]. I advised them that I would need to document all this and we will be doing this hopefully one evening while at training.
>
> In a nut shell, [Plaintiff] has been lying about what occurred during the meeting, while degrading my character and position inside the center. They advised they are concerned about her mental well being and their safety and the units we work with.
>
> They said they haven't come to me because they don't want to bother me or be complainers. I informed them they are always welcome to communicate with me and it is very important to communicate with me when they do not feel safe.[7]

*Id.* Also in this email, Defendant Rosenfeld expressed uncertainty regarding what action should be taken.[8] *Id.* ¶ 64.

The handwritten notes provided to Plaintiff's legal counsel, which appear to reference a conversation between HR and Seation, also indicate concerns about Plaintiff's mental health:

> ~ Meeting w/Jenny [Rosenfeld] + [Plaintiff]
> ~ Around October 1st ~ lasted 3 hrs.
> ~ thought the meeting went well
> ~ only heated part was the first 20 mins. b/t Jenny [Rosenfeld] + [Plaintiff]
> ~ something seems different w/ her over the past couple weeks.
> ~ more moody lately noticed it when coming in for shift change

---

[7] At the December 16, 2019 grievance hearing, Plaintiff's counsel requested that Defendant Egertson provide Plaintiff with Bennett and Whetzel's statements discussed in the email exchanges. *Id.* ¶ 66. Although Defendant Egertson agreed to the request, they were never provided to Plaintiff. *Id.*

[8] She stated:

> As we talked earlier, I am not sure what our next step should be as this is a very gray area in the workplace. Once I have the documentation from [Bennett and Whetzel] I will send it to you, and hopefully we can discuss everything and seek some assistance from human resources and the county attorney if needed.

*Id.* ¶ 64.

*Id.* ¶ 65.

At the grievance hearing, when asked why he would terminate Plaintiff, Defendant Martin cited her statements made on September 13, 2019 as the basis for termination. *Id.* ¶ 67. He also said there was other "troublesome behavior" leading to her termination, after argument that the termination did not follow the Personnel Management Plan for the County's disciplinary ladder format. *Id.* Further, when questioned about any retaliation for the sexual harassment claim that Plaintiff made in September 2018, Defendant Martin claimed to have had no knowledge of it until her grievance filing was received. *Id.* ¶ 68. But he would have learned of the sexual harassment claim when it was referenced by Plaintiff on October 7, 2019, four days before she was placed on paid administrative leave. *Id.*

After the hearing, Defendant Egertson submitted to Plaintiff a letter dated December 17, 2019. *Id.* ¶ 69. It detailed his findings and disposition. *Id.*[9] Plaintiff's counsel also received a

---

[9] The letter stated:

[Plaintiff has] testified that the primary incident that led to your termination was essentially a 'misunderstanding'. It is [her] position that when [she] stated that [she was] 'not doing that,' [she was] responding to a statement regarding [her] desire to avoid having a stressful shift and that [she was] joking, and not a declaration that [she] would not run the requested criminal history report.

[She has] expressed that this single incident should not result in termination, and that any additional problematic behavior that was reported by staff and third parties to [Defendant] Martin, which he may have considered during the course (sic) investigation that support the same concerns stemming from the primary incident, should have been made clearer to [her].

While I am not convinced that [Plaintiff's] termination is unjustified, I believe [her] request for additional information regarding the basis for [her] termination or a completed Written Notice of Disciplinary Action Form to aid [her] in this process to be in earnest and reasonable.

At this time, I am reinstating [Plaintiff] to the status of being on administrative leave, but without pay, and directing that a Written Notice of Disciplinary Action Form be

form titled *County of Culpeper Written Notice of Disciplinary Action*, which included December 26, 2019 as the date of issuance and stated that Plaintiff's termination was effective December 30, 2019. *Id.* ¶ 70. On the form, the only listed basis for termination is her September 13, 2019 statements. *Id.* A three-page letter signed by Defendant Martin and dated December 26, 2019 accompanied the form. *Id.* ¶ 71. Defendant Martin devoted one paragraph to Plaintiff's September 13, 2019 statements and six paragraphs to "additional allegations of misconduct, inappropriate action, altered mental state, and abnormal behavior against Plaintiff Fuller that he claims were discovered during the internal personnel investigation of her." *Id.* He wrote that these allegations "demonstrate[] and support[] [her] failure to uphold standards of conduct related to [her] job duties and performance." *Id.* ¶ 72. He also wrote:

> The additional information that was shared raised important concerns for responder safety and further supported that [Plaintiff] had been engaging in similar (poor standards of) conduct to that of the September 13, 2019 incident, which prompted the investigation in the first place. . . .
>
> [Plaintiff's] coworkers shared that [her] demeanor in the workplace has been erratic and inconsistent. There were multiple reports that [Plaintiff] could in an instance (sic) become angry, withdrawn, zone out, and not answer telephones. It has been reported that some teammates are afraid to approach [Plaintiff] with questions for fear of belittling and unmerited confrontational reception, and that they will wait to engage another supervisor for guidance…
>
> Some coworkers have reported anxiety coming to work because of [Plaintiff] and that they have contemplated calling out sick. . . .
>
> Public safety officers have also reported that [Plaintiff is] rude and unprofessional to them when they are at the center, and that [her] statements and behavior have made it awkward for everyone in the room. It was shared that [Plaintiff is] confrontational, that [she] argue[s] with responders, and that [she] lecture[s] responders in an embarrassing

---

completed and provided to [Plaintiff] by [Defendant] Martin within five (5) working days from the date of this letter.

*Id.*

manner creating a poor working relationship between dispatch and law enforcement. There are law enforcement units that have shared that they do not want to come into the center when [Plaintiff is] working for fear of a confrontation.

*Id.* ¶¶ 74–76.

The letter further stated:

It was shared by individuals that while they have empathy for [Plaintiff], they must share what is taking place because they are genuinely concerned for their safety, the job not being performed correctly and for responder safety. . . .

I also have concern that [Plaintiff] made intentional misstatements to [her] coworkers regarding a meeting [she] had with [Defendant] Rosenfeld and Mr. Seation on or about October 1, 2019, e.g., [she] reported that [she] and [Seation] 'were up for demotion, that [Seation] felt unsafe in the meeting, etc.' Information gathered during the investigation indicate these statements are untrue and without basis in fact. . . .

Due to the results of the internal investigation, there exists reliable information that demonstrates and supports [Plaintiff's] failure to uphold standards of conduct related to [her] job duties and performance. In sum, the results of the investigation have led to the determination that it is in the best interest of Culpeper County that [Plaintiff's] at[-]will employment with the County be terminated.

*Id.* ¶¶ 78–80.

Defendant Martin's letter also referenced Plaintiff's responder safety failures, but Plaintiff asserts that "[n]one of the noted failures are listed with identifying details to authenticate their occurrence as is customary when documenting an error by employees of [Public Safety Communications]." *Id.* ¶ 77.[10]

Plaintiff filed suit against Culpeper County, Virginia; Culpeper County Department of Public Safety Communications; Director of the Culpeper County Department of Public Safety Communications; Deputy Director of the Culpeper County Department of Public Safety

---

[10] Plaintiff argues that "[a]ny one of these failures, if true and actual, would have been substantial grounds upon which to terminate[] the Plaintiff. These allegations without basis in fact present clear and plausible pretext for employment discrimination." *Id.*

Communications; and County Administrator for Culpeper County,[11] asserting retaliation and discrimination under the Americans with Disabilities Act and Rehabilitation Act. Defendants moved to dismiss these claims. Their motion has been fully briefed and is ripe for review.

### III. Standard of Review

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). The purpose of a Rule 12(b)(6) motion is to "test the sufficiency of a complaint," not to "resolve contests surrounding the facts, the merits of a claim, or the applicability of defenses." *King*, 825 F.3d at 214 (quoting *Edwards v. City of Goldsboro*, 178 F.3d 231, 243–44 (4th Cir. 1999)). "Thus, when considering a motion to dismiss, a court must consider the factual allegations in the complaint as true and draw all reasonable inferences in favor of the plaintiff." *Bing v. Brivo Systems, LLC*, 959 F.3d 605, 616 (4th Cir. 2020). Nevertheless, only facts can render a claim for relief plausible. "[F]ormulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. Nor is it sufficient for a plaintiff to plead facts merely consistent with liability. The plaintiff must plead enough factual content to nudge a claim across the border from mere possibility to plausibility. *Id*. at 570; *see also Francis v. Giacomelli*, 588 F.3d 186, 193 (4th Cir. 2009). The Fourth Circuit has directed district courts to construe *pro se* complaints liberally, though "[i]t does not require those courts to conjure up questions never squarely presented to them." *Beaudett v. City of Hampton*, 775 F.2d 1274, 1278 (4th Cir. 1985).

### IV. Analysis

#### A.  The Culpeper County Department of Public Safety is Not a Proper Defendant

---

[11] The Director, Deputy Director, and County Administrator, collectively, will be referred to as the "Individual Defendants."

Plaintiff improperly names the Culpeper County Department of Public Safety as a defendant. The Department of Public Safety Communications lacks capacity to be sued, a standard determined by state law. Fed. R. Civ. P. 17(b); *see also Mukuna v. Gibson*, No. 1:11-cv-493, 2011 WL 3793336, at *5 n.2 (E.D. Va. Aug. 25, 2011) (citing Fed. R. Civ. P. 17(b)(3)). Virginia law dictates that "an operating division of a governmental entity . . . cannot be sued unless the legislature has vested the operating division with the capacity to be sued." *Smith v. Town of South Hill*, No. 3:19-cv-46, 2020 WL 1324216, at *7 (internal citations and quotations omitted) (E.D. Va. Mar. 20, 2020). And "[c]ourts have previously concluded that 'nothing in Virginia law recognizes municipal police departments as entities separate from their respective municipalities.'" *Id.* (internal citations omitted).

"Because [Culpeper County Department of Public Safety] exists as merely an arm of [Culpeper County] as a department of the government without capacity to be sued separately," *see* Va. Code Ann. § 15.2-823, the Court will dismiss the claims brought against Culpeper County Department of Public Safety. *Guerrero v. Deane*, No. 1:09-cv-1313, 2010 WL 670089, at *17 (E.D. Va. Feb. 19, 2010); *see also Mercer v. Fairfax Cnty. Child Protective Services*, No. l:15–cv–302, 2015 WL 5037636, at *3 (E.D. Va. Aug. 25, 2015).

**B. Plaintiff Improperly Sued Individual Defendants in Their Individual Capacity Under the Rehabilitation Act and in Their Official Capacity Under Both Acts**

Plaintiff improperly sued the Individual Defendants in their individual capacity under the Rehabilitation Act. "Neither Title II of the ADA nor Section 504 of the Rehabilitation Act permit individual capacity suits." *Brown v. Dep't of Public Safety and Correctional Servs.*, 383 F. Supp. 3d 519, 552 (D. Md. 2019) (citing *Barnes v. Young*, 565 F. App'x 272 (4th Cir. 2014); *Badillo v. Thorpe*, 158 F. App'x 208, 211 (11th Cir. 2005); *Garcia v. S.U.N.Y. Health Sciences Ctr. of Brooklyn*, 280 F.3d 98, 107 (2d Cir. 2001)); *see also M.S. v. Fairfax Cnty. Sch. Bd.*, No.

– 14 –

1:05CV1476 (JCC), 2006 WL 721372, at *3 (E.D. Va. Mar. 20, 2006) (holding individual defendants cannot be sued under the Rehabilitation Act in their individual capacity).

And Plaintiff asserts an official capacity claim against the Individual Defendants under the Rehabilitation Act and the ADA, while simultaneously suing Culpeper County for the same claims. Compl. at 2–3. An official-capacity suit "generally represent[s] only another way of pleading an action against an entity of which an officer is an agent." *Monell v. New York City Dep't of Soc. Servs.*, 436 U.S. 658, 690 n.55 (1978). Because Plaintiff's official capacity claims are redundant to her claims against the County, they will be dismissed. *See Love-Lane v. Martin*, 355 F.3d 766, 783 (4th Cir. 2004) (citing *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985); *Hicks v. Halifax Cnty. Bd. of Educ.*, 93 F. Supp. 2d 649, 667 (E.D.N.C. 1999)).

### C.  The Statute of Limitations Bars Plaintiff's Rehabilitation Act § 504 Claim

Because the Rehabilitation Act does not include an express statute of limitations, courts look to the most appropriate statute of limitations under state law. *Wolsky v. Medical Coll. of Hampton Roads*, 1 F.3d 222, 223–24 (4th Cir. 1993). The Virginia Rights of Persons with Disabilities Act provides the statute of limitations for actions under the Rehabilitation Act in Virginia, and that statute of limitations is one year. *Id.*; Va. Code § 51.5-46(B).

A district court may consider the statute of limitations—an affirmative defense—at the motion to dismiss stage when the facts establishing the defense are apparent on the face of a plaintiff's complaint. *Goodman v. Praxair*, 494 F.3d 458, 464 (4th Cir. 2007). Plaintiff alleges her terminations occurred on November 5, 2019 and December 30, 2019. Compl. ¶¶ 2, 4. She

filed her Complaint on October 12, 2022. Thus, her claim that Defendants violated the

Rehabilitation Act is barred by the one-year statute of limitations and will be dismissed.[12]

### D.  Plaintiff Has Not Alleged That She Engaged in a Protected Activity Under the ADA

Plaintiff asserts that the Defendants violated the ADA because her termination was in

retaliation for her engaging in protected activity. Compl. ¶ 5. To state a claim for retaliation,

Plaintiff "must show that the adverse employment action took place after the protected activity

and because of the protected activity." *Byers v. HSBC Fin. Corp.*, 416 F. Supp. 2d 424, 438

(E.D. Va. 2006) (citing *Thompson v. Potomac Elec. Power Co.*, 312 F.3d 645, 651 (4th Cir.

2002); *Dowe v. Total Action Against Poverty*, 145 F.3d 653, 657 (4th Cir. 1998)). 42 U.S.C.

§12203(a) states that "[n]o person shall discriminate against any individual because such

individual has opposed any act or practice *made unlawful by this chapter* or because such

individual made a charge, testified, assisted, or participated in any manner in an investigation,

proceeding, or hearing under this chapter." (emphasis added). While "[a] plaintiff need not

establish that the conduct she opposed actually constituted an ADA violation," she "must allege

the predicate for a reasonable, good faith belief that the behavior she is opposing violates the

ADA." *Freilich v. Upper Chesapeake Health, Inc.*, 313 F.3d 205, 216 (4th Cir. 2002) (internal

citations omitted). And to establish a prima facie case for retaliation, a plaintiff must allege the

following: "(1) that she has engaged in conduct protected by the ADA; (2) that she suffered an

adverse action subsequent to engaging in the protected conduct; and (3) that there was a causal

---

[12] If claims are made possible by the ADA Amendments Act, a four-year statute of limitations governs the ADA claims. *See Latson v. Clarke*, 346 F.3d 831, 858 (W.D. Va. 2018). As the ADA Amendments Act expanded coverage for the "regarded as" prong of the definition of disability, *see* 122 Stat 3553(a)(3)(A)–B, and the Court must liberally construe the *pro se* complaint, the Court construes Plaintiff's ADA claims as having a four-year statute of limitations.

link between the protected activity and the adverse action." *Id.* (citing *Rhoads v. FDIC*, 257 F.3d 373, 392 (4th Cir. 2001)).

Plaintiff cannot meet the first element of establishing a prima facie claim of retaliation under the ADA. She asserts that she was retaliated against for her sexual harassment claim, which she describes as "the protected activity of discussing potential discrimination or retaliation for making the claim." Compl. ¶ 36. But the ADA covers disability discrimination, not sex-based discrimination. Thus, this claim will be dismissed.

### E.  Plaintiff Has Not Alleged Sufficient Facts to Show Termination Because She Was "Regarded As" Having a Disability

Plaintiff asserts she was discriminated against as an individual regarded as having a mental impairment and wrongfully discharged. Compl. at 22–25. To move forward on this claim, Plaintiff must allege facts supporting that: "(1) [s]he is within the ADA's protected class; (2) [s]he was discharged; (3) at the time of [her] discharge, [s]he was performing the job at a level that met [her] employer's legitimate expectations; and (4) [her] discharge occurred under circumstances that raise a reasonable inference of unlawful discrimination." *Haulbrook v. Michelin N. Am.*, 252 F.3d 696, 702 (4th Cir. 2001).

Plaintiff does not allege facts showing she was performing the job at a level that met her employer's legitimate expectations. The facts support that she failed to act appropriately as a shift supervisor, which is a nondiscriminatory reason for her termination. For example, on October 9, 2019, Defendant Rosenfeld emailed Defendant Martin, stating: "I explained that [Plaintiff] making the comment that she was not going to run the criminal history, that she refused to do it, was absolutely unacceptable and would not be tolerated; especially in her position as a shift supervisor." *Id.* ¶ 62. The reason given for her termination by Defendant Martin was her September 13, 2019 statements, as well as other "troublesome behavior." *Id.*

¶ 67.[13] Coworkers expressed that her "demeanor in the workplace ha[d] been erratic and inconsistent," as "[t]here were multiple reports that [she] could in an instance (sic) become angry, withdrawn, zone out, and not answer telephones." *Id.* ¶ 75. Also, "[i]t ha[d] been reported that some teammates [we]re afraid to approach [her] with questions for fear of belittling and unmerited confrontational reception, and that they [would] wait to engage another supervisor for guidance." *Id.* Additionally, there were concerns about her making "intentional misstatements" to her coworkers about the October 1, 2019 meeting. *Id.* ¶ 79.

Though Plaintiff consistently received high evaluations in quality compliance reviews and yearly evaluations during her employment, her last received evaluation was dated December 29, 2018. *Id.* ¶ 28. And though promoted twice, her last promotion was on January 4, 2019. *Id.* ¶ 29. Thus, substantial time passed between her evaluation and promotion and the allegations in Plaintiff's Complaint, which began in September 2019.

Thus, Plaintiff's ADA wrongful discharge claim will be dismissed.

### V. Conclusion

For the foregoing reasons, the motion to dismiss is granted.

\* \* \* \*

The Clerk of the Court is hereby directed to send this Memorandum Opinion to all counsel of record.

Entered this __13th___ day of April, 2023.

---

[13] For example: "Public safety officers have also reported that [Plaintiff is] rude and unprofessional to them when they are at the center, and that [her] statements and behavior have made it awkward for everyone in the room." *Id.* ¶ 76. And "[i]t was shared that [she is] confrontational, that [she] argue[s] with responders, and that [she] lecture[s] responders in an embarrassing manner creating a poor working relationship between dispatch and law enforcement." *Id.*

NORMAN K. MOON
UNITED STATES DISTRICT JUDGE